IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 9, 2007

## STATE OF TENNESSEE v. MARQUETTE HOUSTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08488    James C. Beasley, Jr., Judge**

**No. W2006-00095-CCA-R3-CD  - Filed June 29, 2007**

The defendant, Marquette Houston, appeals as of right from his conviction of second degree murder for which he received a twenty-five-year sentence as a violent offender.  In this appeal, the defendant contends that: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in denying the admission of first aggressor evidence; (3) the trial court erred in admitting the defendant's statement to police; and (4) the trial court erred in imposing an excessive sentence.  Following our review of the record, parties' briefs and applicable law, we affirm the defendant's convictions.  However, we vacate the sentence imposed by the trial court and remand this case for resentencing under the 1989 Sentencing Act with consideration of the constitutional restrictions upon enhancing the defendant's sentence above the presumptive minimum.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part,**
**Vacated in Part, and Remanded**

J.C. MᶜLɪɴ, J., delivered the opinion of the court, in which Dᴀᴠɪᴅ G. Hᴀʏᴇs and Nᴏʀᴍᴀ MᴄGᴇᴇ Oɢʟᴇ, JJ., joined.

Phyllis Aluko (on appeal) and Michael Johnson and Amy Mayne (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Marquette Houston.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles Bell and Pam Fleming, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

The facts giving rise to this appeal are as follows.  Arizona Franklin testified that in the early evening hours of April 28, 2003, her husband of fifty years, Claude Franklin, was shot and killed while he was outside mowing the lawn of their residence near Hollywood Street.  Upon hearing

gunfire, Mrs. Franklin went outside and found her husband lying in the yard, bleeding from his chest area. Mrs. Franklin called 911 and accompanied her husband to the hospital. Her husband died a few days later.

Sergeant James L. Fitzpatrick of the Memphis Police Department, testified that he investigated the crime scene approximately one-and-a-half hours after the shooting occurred. He and other investigative officers located and gathered evidence including several .40 caliber shell casings. After talking with witnesses, Sergeant Fitzpatrick and other officers attempted to locate Mr. Bernard "Chuck" Barnes and Mr. Albert "Mac Al" Thomas. Mr. Barnes was eventually located and was en route to the homicide office for questioning when Mr. Thomas, Mr. Thomas' brother and the defendant were seen sitting in a vehicle. The officers transporting Mr. Barnes stopped the vehicle and detained Mr. Thomas and the defendant for questioning. Sergeant Fitzpatrick took Mr. Thomas' statement while another officer took the defendant's statement. After further investigation, the defendant was arrested and charged.

Bernard "Chuck" Barnes testified that at the time of the shooting, he had known Albert "Mac Al" Thomas for about three years after rebuilding a motor in Mr. Thomas' car in 2001. Mr. Barnes stated that he and Mr. Thomas had a series of heated arguments over a $35 repair bill owed for work done on the motor in 2001. According to Mr. Barnes, on April 28, 2003, he was driving his 1985 Cadillac limousine on Hollywood Street when he was flagged down by Mr. Thomas, who was a passenger in a "goldish-looking" car, driven by a female. Mr. Barnes pulled over, got out of the Cadillac, and asked Mr. Thomas why he was bothering him. Mr. Barnes then returned to the Cadillac and continued to drive down Hollywood. However, Mr. Thomas and his female companion followed him, so Mr. Barnes pulled over onto the right-hand side of the street. He got out of the Cadillac and approached Mr. Thomas, whereupon, he observed that Mr. Thomas was on the phone. Mr. Barnes again told Mr. Thomas to leave him alone.

Mr. Barnes testified that seconds later a car came "zooming" down Hollywood, made a right turn, and drove up a hill onto Vollintine Street. The car stopped at the top of the hill and someone started shooting at him. One of the bullets struck the back window of the Cadillac and dropped into the backseat. Mr. Barnes later identified the defendant as the shooter. Mr. Barnes testified that he reacted to the defendant's shooting by reaching for a .9mm handgun in the Cadillac and shooting at the defendant's position on the hill seven or eight times. Mr. Barnes also attempted to shoot at Mr. Thomas but could not because he was out of bullets.

Mr. Barnes testified that he drove away from the area, dropped off the Cadillac, and got into a brown Nissan Maxima. After dropping his stepbrother, Marcus Tate, and another man, off at the liquor store, he eventually drove to Mr. Thomas' house and, after reloading his .9mm handgun, shot at the house. He avoided the police after leaving the Maxima at his cousin's house and returned to his home. However, the day after the shooting, he contacted the police and made arrangements to be picked up at his home. When the police arrived, he showed police where he had hidden his gun and ammunition. He also told police where to find the Cadillac. While being transported to the police station, he saw Mr. Thomas, Mr. Thomas' brother, and the defendant. He immediately

identified the defendant as the shooter. Mr. Barnes reiterated that he did not know the defendant prior to being shot at by him.

Several police detectives testified regarding the recovery and collection of evidence. According to their testimony, three live .9mm rounds were found in the Maxima. The .9mm gun and two ammunition clips were collected from the location where Mr. Barnes had hid them. A total of nine live rounds were collected from the clips. A bullet fragment was collected from the rear floorboard of the Cadillac. Spent .9mm shell casings and a bullet fragment were found on Hollywood Street. Several spent .40 caliber bullet casings and a beer can were collected from the Vollintine Street area. Pictures of bullet holes were taken of the crime scene where the victim had been shot, but no bullets were recovered.

Dr. Karen Elizabeth, the county's chief medical examiner, testified that Claude Franklin's autopsy report revealed he died of internal bleeding caused by a gunshot wound to his chest. A copper-jacketed bullet was removed from Mr. Franklin's body. The bullet was identified as Exhibit 11. Agent Don Carman, a forensic firearms examiner for the Tennessee Bureau of Investigation, testified that the bullet recovered from Mr. Franklin's body and identified as Exhibit 11 was determined to be a .40 caliber. Agent Carman also testified that the .40 caliber bullet recovered from Mr. Franklin, a .40 caliber bullet collected from the floorboard of a vehicle, and other .40 caliber bullet fragments and shell casings found on Hollywood and Vollintine were shot from the same firearm, though Agent Carman noted he did not have this particular firearm in his possession to test. Agent Carman further noted that these .40 caliber bullets were not fired from the .9mm pistol. Agent Carman stated that he tested the .9mm bullet fragment and shell casings found on Hollywood and determined that they were all fired from the same .9mm pistol which was tested and examined.

Detective James P. Smith of the Memphis Police Department testified that he and another detective questioned the defendant about the shooting. After the defendant was advised of his *Miranda* rights, the defendant gave a statement in response to Detective Smith's questions. The statement reads as follows:

> Q:   On Monday, April 28, 2003, Claude Lee Franklin was fatally shot outside of 950 Hollywood. Are you the person responsible for his death?
>
> A:   No sir.
>
> Q:   Do you know the person or person(s) responsible for Franklin's death?
>
> A:   No, sir.
>
> Q:   Tell me the events that occurred during, before and after the shooting that occurred on Monday, April 28, 2003 at the corner of Hollywood and Vo[l]lintine.

A:    Chuck pulled down on me when I was walking down to my grandmother's street . . . . I am walking down the street and Chuck is following me. I stopped and he did too. I then walked up to [the] railroad track and went up the little ramp thing. . . . Chuck and I [was] having words, then Chuck got out the car on Hollywood and begin to throw hand signs and saying "Boy, you got me f**ked up!" By that time, Chuck fired some shots off at me, then I fired my 40 three times at Chuck but the gun had jammed. I struck out running down to Springdale to my girlfriend['s] house . . . who lived in the Evergreen. That was it between us. This all started on Saturday, April 26, 2003 in the club, Hay Baby's, when Chuck and I got into it about a girl.

Q:    Where is the weapon . . . which you had the day of April 28, 2003?

A:    I throw it in the bushes on the hill near Hollywood and Vol[l]intine.

Q:    Tell me in detail [what] did you do with the gun after the shooting?

A:    After I finish[ed] shooting I ran down the street I was shooting on. I don't know the name of the street but it lead me to Springdale Street. I then [threw] the gun behind [somebody's] house.

      . . . .

Q:    Describe the vehicle in which Chuck was driving?

A:    A white old model Limo with 20-inch rims.

Q:    How many rounds did Chuck fire at you?

A:    Man, I know it was about seven or nine.

Q:    [Was] there anyone in your view when you fire[d] your weapon?

A:    No, sir.

Q:    When did you learn about the death of Franklin?

A:    Man, I swear I don't want to be in this incident. It hurt me man. I feel it in my heart that I didn't kill that man. About 11:00 p.m. or 12:00 p.m., [sic] my little cousin, Po Bear, called me and told me that the man was dead.

Q:    Is the 40 caliber the only gun you own?

A:    Yes . . . .

Q:     Are you a member of a gang?

A:     No . . . .

Q:     How long have you known Chuck?

A:     It's been like a couple of months.

Q:     During [your] time knowing Chuck, has this been the first altercation between you and Chuck?

A:     Yes Sir.

Q:     On the day of the shooting, [was] there anyone else involved in the altercation?

A:     No Sir, [i]t was just me and Chuck nobody else had anything to do with it.

Q:     Why did you have this gun?

A:     Because people were telling me that Chuck was on Heroin and that he like to rob folks.  I heard Chuck was involved in a carjacking where he took a Nissan with a baby in it.

Q:     Describe the weather and light condition during the shooting?

A:     It was hot and dusk.

Q:     Prior to the shooting, you stated you stopped near a ramp.  Where is this ramp located?

A:     Vol[l]intine and Hollywood near the railroad track area.

       . . . .

Q:     Describe to me what type of gun did Chuck have?

A:     I believe it was a 9mm, because the way it was shooting.

Q:     Did you give this statement freely and voluntarily without threats, promises, or coercion?

A:     Yes.

-5-

Q:     Is there anything else that you would like to add to your statement that would aid us in this investigation?

A:     No, Sir.

Q:     I'm going to ask you to read your 4 page statement and if you find it to be true and correct place your initials in the bottom right hand corner of the first pages and place your signature, date and time on the last page in the space provided. Do you understand?

A:     Yes.

The defendant then initialed each page and signed the last page, "Marquette Houston, 4/29/2003, at 8:10 P.M." After reading the defendant's statement to the jury, Detective Smith noted that the .40 caliber gun was never found.

Albert "Mac Al" Thomas testified that he was currently in federal custody for unlawful possession of a weapon. Mr. Thomas stated that Mr. Barnes was a mechanic in the neighborhood and had worked on his car. According to Mr. Thomas, on April 28, 2003, Mr. Barnes approached him on Hunter Street to discuss a $30 debt incurred two years ago. Approximately thirty minutes later, Mr. Thomas encountered Mr. Barnes again while driving down Hollywood Street whereupon Mr. Barnes pulled up behind him and began driving erratically. Mr. Barnes then drove past Mr. Thomas, pulled over to the side of the road, and jumped out of his car with a gun pointed up in the air. Mr. Barnes was hollering, but Mr. Thomas could not understand what he was saying. Mr. Thomas saw a black truck drive by and turn up the street ramp on Vollintine. Mr. Thomas then heard gunshots and to his surprise saw the defendant up on the street ramp shooting.

Mr. Thomas testified that he had been good friends with the defendant for about three years and had seen him earlier on the day of the shooting. According to Mr. Thomas, he had a conversation with the defendant about Mr. Barnes in which the defendant said he "was going to get up with [Mr. Barnes] when he see him." Mr. Thomas explained that the expression, "get up with him" was street slang and could mean many things including "you going to fight him, jump on him, you know, shoot him, whatever."

Mr. Thomas testified that Mr. Barnes had his gun pointed in the air, but the defendant was the first person to start shooting. When the defendant started shooting from the street ramp, Mr. Barnes responded by shooting everywhere because he did not know where the defendant was positioned. At one point, Mr. Barnes fired directly at Mr. Thomas but did not hit him. Mr. Thomas made a U-turn in the middle of Hollywood, parked his car, and jumped into another car. He did not see the defendant again until the next day. At that time, he and his brother picked up the defendant and the three of them drove toward downtown to see an attorney. Coincidentally, when they stopped at a traffic light, they were stopped by the same police transporting Mr. Barnes to the police station. Mr. Thomas further testified that in his written statement, he told the police that the defendant had

a .40 caliber weapon. Mr. Thomas also acknowledged that he did not tell police about the defendant's remark about "getting up" with Mr. Barnes.

The defendant testified that he had known Mr. Thomas since they were young children. He had seen Mr. Barnes around the neighborhood and knew he had a reputation for robbing people. He had also heard that Mr. Barnes did not like him because of a girl; however, Mr. Barnes had never approached him about the situation.

The defendant testified that on April 28, 2003, Mr. Barnes spoke to him while they were on Winnona Street. After the conversation, the defendant walked toward Mr. Thomas' house. As he traveled down Hunter Street, he saw Mr. Thomas jump into a car and leave. Later that day, around 5:30 p.m., Mr. Barnes appeared on Hunter Street and blocked the path of the black Suburban truck the defendant was driving. The defendant stated that Mr. Barnes appeared to be looking for someone in the truck.

The defendant testified that around 6:00 p.m., he was driving down Hollywood when he saw Mr. Thomas and Miss Sharon pulled over on the side of the road. He then saw Mr. Barnes approaching Mr. Thomas and Miss Sharon with a gun pointed at Mr. Thomas. Believing that Mr. Barnes intended to harm Mr. Thomas and Miss Sharon, he drove up the ramp and shot his gun once in the air in an attempt to scare Mr. Barnes away. In response, Mr. Barnes ducked into his car then started shooting at him, so he returned fire. A stipulation was admitted into evidence showing that Mr. Barnes had been previously convicted of two assaults.

Based upon the evidence presented, the jury found the defendant guilty of second degree murder. Thereafter, the defendant was sentenced to twenty-five years as a violent offender.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence is insufficient to support his second degree murder conviction because the proof shows he acted in defense of others and in self-defense.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest

legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. *See* Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *See id.* § 39-11-302(b). Tennessee's self-defense statute provides in relevant part:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.
>
> . . . .
>
> The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:
>
> (1) The person abandons the encounter or clearly communicates to the other the intent to do so; and (2) The other nevertheless continues or attempts to use unlawful force against the person.

*Id.* § 39-11-611(a) and (d). Tennessee's "defense of another" statute provides as follows:

> A person is justified in threatening or using force against another to protect a third person, if:
>
> > (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

-8-

> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

*Id.* § 39-11-612. The claim of self-defense or defense of another is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

After reviewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to support the defendant's conviction of second degree murder. The evidence established that the defendant had some conflict with Mr. Barnes. On April 28, 2003, the defendant knowingly initiated a gun battle with Mr. Barnes by shooting at him in the middle of a residential neighborhood. As a result of the defendant's conduct, Mr. Claude Franklin, an innocent bystander, was struck by a bullet fired from the defendant's gun and was killed. From the evidence, the jury could have rationally found that the defendant's action in shooting the victim was excessive and unnecessary for the defense of others or self-defense. In other words, a rational jury could have determined that the defendant's use of deadly force was not founded on reasonable grounds. As previously noted, the credibility and weight given to a witnesses's testimony are issues resolved by the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659. The jury, as was their prerogative, chose not to credit the defendant's theory of self-defense or defense of others, and we will not second-guess the factual determinations of the jury. Accordingly, the defendant is not entitled to relief on this issue.

## II. First Aggressor Evidence

The defendant next contends that the trial court erred in excluding witness testimony of a prior bad act of Mr. Barnes. The defendant argues that such testimony would have aided the defense by circumstantially proving Mr. Barnes was the first aggressor in the shooting.

During a hearing, out of the presence of the jury, the defendant presented as an offer of proof the testimony of Angela Brittenum. Ms. Brittenum testified that about a week before trial, Mr. Bernard "Chuck" Barnes got into an argument with her brother, Booker Leshawn Hunter. Ms. Brittenum recounted that Mr. Barnes was drunk and became angry at her brother after her brother told Mr. Barnes he was "fixing" to take him home. Mr. Barnes and her brother were outside at the time. From inside the house, Ms. Brittenum heard Mr. Barnes tell her brother "give me my gun, man, give me my gun." Then, Ms. Brittenum heard gunshots. She ran outside and saw Mr. Barnes standing and her brother lying on the ground. She saw Mr. Barnes drop a gun and pick it up again. Ms. Brittenum stated that she struggled with Mr. Barnes and wrested the gun away from him and ran inside the house with it. Ms. Brittenum then called 9-1-1.

After hearing Ms. Brittenum's testimony, the trial court ruled as follows:

[T]he testimony of Ms. Angela Brittenum, as to the incident involving Mr. Barnes two weeks ago, that testimony is not sufficient in this Court's opinion to show in a clear and convincing manner that Mr. Barnes was an aggressor in that transaction.

Ms. Brittenum did not see the incident. The testimony that she gave was that there was a disagreement going on between Mr. Barnes and her brother. She heard Mr. Barnes ask for his gun from her brother, and then there were shots fired and her brother was shot, and Mr. Barnes has been arrested and charged with that.

But there's no indication of what occurred, how it occurred, under what circumstances it occurred, and I'm not satisfied that there's enough clear and convincing evidence that Mr. Barnes was acting in an aggressive nature simply because he's been charged.

I just haven't heard sufficient proof that I think would allow that testimony to come before the jury under the [guise] of corroboration of self-defense argument; or if I understand correctly . . . defense of another that has not actually been shown or put before the jury yet.

. . . I do not find that Ms. Brittenum's testimony was sufficient, clear and convincing evidence of aggressive behavior by Mr. Barnes that I would allow that in. So if that's what's been presented to me at this point I rule that [her testimony] is not admissible . . . .

We begin our review by noting that "[r]ulings on the admissibility of evidence are largely within the sound discretion of the trial court, and on appellate review, a trial court's ruling to admit or exclude evidence will not be disturbed unless it appears that such a ruling amounts to an abuse of that discretion." *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). "An appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*.

Under limited circumstances, "specific violent acts of the victim are admissible to *corroborate* the defendant's assertion that the victim was the aggressor."[1] *State v. Furlough*, 797

---

[1] As an aside, different admissibility rules apply when testimony is offered to demonstrate the defendant's fear of the victim (i.e., the defendant's mental state) versus when testimony is offered to demonstrate who was the first aggressor. *See State v. Hill*, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994), *perm. to app. denied* (Tenn. 1994). The different rules are aptly explained by this court in *State v. Jerry Dale Bennett*, No. 03C01-9304-CR-00115, 1994 WL 53645 (Tenn. Crim. App., at Knoxville, Feb. 24, 1994), and quoted in pertinent part below:

When self-defense is raised,

(continued...)

S.W.2d 631, 649 (Tenn. Crim. App. 1990 ), *perm. to app. denied*, (Tenn. 1990) (emphasis added); *see also State v. Hill*, 885 S.W.2d 357, 361-62 (Tenn. Crim. App. 1994), *perm. to app. denied* (Tenn. 1994). First aggressor evidence is evidence which would address "the animus of the [victim], his conduct and motives, and [is] offered to show which party began or provoked the fight." *State v. Jerry Dale Bennett*, No. 03C01-9304-CR-00115, 1994 WL 53645, *3 (Tenn. Crim. App., at Knoxville, Feb. 24, 1994) (quoting *Little v. State*, 65 Tenn. 490, 493 (1873)). "[B]efore a defendant can offer proof of evidence of first aggression . . . [s]elf defense must be at issue by the evidence in the record, not by the words and statements of counsel." *State v. Lateral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, *4 (Tenn. Crim. App., at Jackson, Dec. 15, 1993), *perm. to app. denied* (Tenn. 1994). Likewise, first aggressor evidence, albeit admissible to corroborate a defendant's claim of self-defense, is, at minimum, subject to the balancing test set forth in Tennessee Rule of Evidence 403. *See Furlough*, 797 S.W.2d at 650; *see also Jolly*, 1993 WL 523590, *4; *but compare*, *State v. Ruane*, 912 S.W.2d 766, 779-80 (Tenn. Crim. App. 1995) (suggesting that defendant's desired use of witness testimony to prove first aggression amounts to character evidence of the victim's propensity for violence and is thus subject to evidentiary limitations set forth in Tenn. R. Evid. 404 and 405).

We conclude that the trial court did not abuse its discretion in excluding Ms. Brittenum's testimony. As the trial court aptly noted, Ms. Brittenum observed no act of violence by Mr. Bernard. As such, the testimony of Ms. Brittenum was of little to no probative value in corroborating the defendant's claim that Mr. Bernard was the first aggressor. Additionally, under the unique facts of this case, Mr. Bernard was thoroughly questioned by the defense at trial and a stipulation was admitted into evidence indicating that Mr. Bernard had been previously convicted of two assaults. The defendant also testified. Therefore, the defendant had ample opportunity to establish his claim that Mr. Bernard was the first aggressor. Accordingly, the trial court did not abuse its discretion in excluding the evidence because the probative value of the evidence in question was substantially outweighed by prejudice, confusion of the issues, and needless presentation of cumulative evidence. Moreover, even assuming *arguendo* that the trial court erred in excluding the speculative testimony,

---

[1](...continued)

1. The defendant and other witnesses may testify to the victim's general reputation for violence or peacefulness in the community on direct or cross-examination.

2. The defendant may testify on direct examination about threats or violence to the defendant or others if the defendant knew about the threats at the time of the offense. Since this testimony is offered to establish defendant's state of mind at the time of the offense, the knowledge of those events is a prerequisite.

3. Third persons may testify about violent acts or threats toward them about which the defendant had no knowledge at the time of the offense if the evidence of the victim's violent acts or threats is offered to corroborate a claim of self-defense by proving that the victim was the first aggressor.

. . . .

*Id*. at *4 n.6.

which was only admissible for a limited corroborative purpose, the error was harmless. *See* Tenn. R. App. P. 36(b).

### III. Motion to Suppress Statement to Police

The defendant next contends that the trial court erred in admitting his statement to police because it was obtained in violation of his constitutional rights.

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, government authorities are prohibited from using statements made by the accused during custodial interrogation unless the accused has been previously advised of his or her constitutional right against compulsory self-incrimination and right to an attorney, and the accused knowingly and voluntarily waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily and knowingly made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, coercive police activity is a necessary predicate to finding that a confession is not voluntary." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted).

When reviewing the trial court's decision on a motion to suppress, this court conducts a de novo review of the trial court's conclusions of law and application of law to facts. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).

At the suppression hearing, Sergeant Fitzpatrick testified that the defendant was brought to the homicide office sometime in the afternoon of April 29, 2003. Thereafter, around 6:00 p.m., he and Sergeant Sims[2] read the defendant his *Miranda* rights prior to conducting a brief oral interview. After reading the defendant his rights, they gave the defendant the waiver of rights document and had him read aloud the first line to make sure he could read. The defendant was then allowed read the remainder of the waiver to himself. The defendant signed and dated the waiver of rights document and indicated he understood his rights.

---

[2] The record reflects that Sergeant Sims passed away prior to the hearing on the motion to dismiss.

Sergeant Fitzpatrick testified that he had not coerced the defendant to sign the waiver of rights document and no promises or threats were made to the defendant. According to Sergeant Fitzpatrick, the defendant was very cooperative in responding to questions about the homicide. The defendant did not appear under the influence of alcohol or drugs and did not appear unusually sleepy. During the brief oral interview, the defendant indicated he had a tenth grade education and could read and write. Although Sergeant Fitzpatrick was only present for the initial oral interview, he testified that there were no significant discrepancies between the oral interview and the defendant's subsequent statement. Sergeant Fitzpatrick further testified that after the initial interview, he and Sergeant Sims both left the defendant in order to interview other suspects. At no time did he observe Sergeant Sims strike the defendant. At no time did the defendant ask for a lawyer.

Detective J.P. Smith testified that around 7:00 p.m., he and another detective were directed by Sergeant Fitzpatrick to take the defendant's statement. Prior to taking the defendant's statement, the defendant was escorted from the interview room to Detective Smith's desk in an open area. According to Detective Smith, the defendant was read his *Miranda* rights. The defendant did not smell or appear to be under the influence of any drugs or alcohol. The defendant was cooperative and no threats or promises were made to him. The defendant was not hit, threatened, or coerced. The defendant was given a Coke to drink and some crackers. It took a little over an hour to take the defendant's statement. The defendant was given his statement for review and was told to make any corrections on the statement. The defendant initialed each page of the statement without making any corrections and signed the last page with the time reflecting 8:10 p.m., on April 29, 2003.

The defendant testified that he was arrested around 1:30 p.m., whereupon he told police he wanted his lawyer present when he was to be questioned. Subsequently, he was taken downtown to the homicide office. After sitting for a couple hours, he was escorted to another room by Sergeant Sims and another guy. Once there, he told Sergeant Sims he wanted his lawyer present. Sergeant Sims responded by making threats, pounding the desk, and slapping the back of the defendant's head. The defendant was then left in the room for another couple of hours. At some point, Detective Smith and another detective took his statement.

The defendant testified that prior to being arrested he had stayed up all night and had taken some cocaine and liquid heroin. However, the defendant acknowledged that he did not tell the detectives about this. The defendant recounted that he was arrested while en route to see his attorney. The defendant acknowledged that he signed the waiver of rights document prior to the oral interview, but he asserted that he did not read the document before signing it. The defendant admitted that prior to giving his statement to Detective Smith, he was again advised of his *Miranda* rights, and he told the detectives that he understood his rights. However, the defendant asserted that he really did not understand his rights and did not know his statement could be used against him. He further asserted that he did not read over his statement because he could not read, but he did not tell the detectives that he could not read. The defendant admitted that he signed his statement and initialed every page. The defendant further admitted that he did not tell Detective Smith or the other detective that he wanted a lawyer.

-13-

At the conclusion of the hearing, the trial court accredited the testimony of the state witnesses. The trial court noted that the defendant indicated he understood his *Miranda* rights by signing the waiver of rights document, by verbal acknowledgment, and by signing and initialing his statement. The court also noted that there was no indication that the defendant was threatened or coerced into giving a statement. The court observed that the defendant indicated he could read by reading a line from the waiver of rights document. The court further observed that the evidence indicated that the defendant was alert, attentive, and cooperative and did not appear to be under the influence of an intoxicant or drug of any kind. The court then found the following:

> I do not find that [the defendant's] rights were violated. I do not find that the members of the Police Department violated his constitutional rights either under the United States or the State of Tennessee. I find that he was advised of his rights, that he acknowledged an understanding of those rights, that he acknowledged a waiver of those rights and that he gave his statement freely and voluntarily without threats, without coercion, without intimidation of any kind and signed not only the waiver of rights form but the statement of the details that he had given to the officers, again, freely and voluntarily, fully knowing what his rights were and waiving those rights in giving this statement. So I find that there's no basis for the Court to suppress the . . . statement that was given, and I will deny the Motion to Suppress.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings that the defendant knowingly and voluntarily waived his *Miranda* rights and freely gave statements concerning his involvement in the shooting death of Mr. Franklin. Accordingly, we hold that the trial court properly denied the defendant's motion to suppress, and this issue is without merit.

## IV. Sentencing

The defendant next contends that the trial court erred by imposing an excessive sentence of twenty-five-years for his second degree murder conviction. Specifically, the defendant argues that the trial court erred in not finding any statutory mitigating factors and improperly applying certain enhancement factors.

When an accused challenges the length and manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401. This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. We will uphold

the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

The record reflects that the trial court found the following enhancement factors applicable:

The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

The offense involved more than one victim;

The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense;

The defendant had no hesitation about committing a crime when the risk to human life was high;

The crime was committed under circumstances which the potential for bodily injury to the victim was great.

The trial court stated that it found no statutory mitigating factors but it would consider mitigating factors of the defendant's young age and his somewhat stable work history. The trial court also indicated that it was sentencing the defendant pursuant to the 2005 amendments to the sentencing act.[3]

We need not reach the merits of this sentencing issue as it appears from the record that the trial court incorrectly sentenced the defendant pursuant to the 2005 amendments to the 1989 Sentencing Act. To clarify, certain provisions of the 1989 Sentencing Act were amended in 2005 to reflect an advisory, non-mandatory sentencing scheme. *See e.g.,* Tenn. Code Ann. §§ 40-35-114, -210. It was specifically noted that the amended provisions applied to sentencing for criminal offenses committed on or after June 7, 2005, but that offenses committed prior to June 7, 2005, would be governed by prior law. It was also noted that a defendant who is sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended

---

[3] At the sentencing hearing, the trial court stated:

Under the sentencing laws as they now stand, there's no presumptive minimum. There's no presumptive starting point. The Court is to consider the full range of punishment for this offense, which is a Class-A felony, which would be fifteen to twenty-five years. The Court is not mandated or required to consider all of these enhancement factors. The Court is given guidance and is to look at and to consider these factors as to what if any emphasis and weight the Court wants to give to them in imposing sentences. So that's the status of the law as I understand it at this time.

provisions of the Act by executing a waiver of ex post facto protections. *See* Pub. Acts, Ch. 353, § 18; Tenn. Code Ann. § 40-35-210 (Supp. 2005). However, the record reflects that the defendant committed the offense of second degree murder prior to the effective date of these amended provisions. While the defendant could have elected to be sentenced pursuant to these amended provisions, the record on appeal does not contain a waiver showing that he did so. Thus, the amended 2005 provisions are not applicable in the defendant's case and the defendant must be resentenced pursuant to the sentencing statutes in effect at the time the offense was committed.

Pursuant to the pre-2005 statutory sentencing scheme, the trial court is required to impose a presumptive sentence, starting at the midpoint of the sentencing range, then adjust the sentence within the range as appropriate based upon the presence or absence of mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114. *See* Tenn. Code Ann. § 40-35-210(c) (2003). In this case, the presumptive sentence is twenty years because second degree murder is a Class A felony and the sentencing range for a Range I, standard offender who commits a Class A felony is fifteen to twenty-five years. *See id.* §§ 39-13-210(c), - 40-35-112(1).

Also, the use of the pre-2005 sentencing scheme requires the trial court to evaluate the defendant's Sixth Amendment rights pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004). In *Blakely*, the United States Supreme Court held that the maximum sentence a judge may impose is one based solely on the facts reflected in a jury verdict or admitted by the defendant. *Id.* at 303. Although in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), the Tennessee Supreme Court characterized the pre-2005 statutory sentencing scheme as a non-mandatory, advisory sentencing scheme which did not violate the *Blakely* decision; *Gomez* was recently vacated by the United States Supreme Court and the case remanded for reconsideration in light of *Cunningham v. California*, --- U.S. ----, 127 S.Ct. 856 (2007).

In *Cunningham*, the United States Supreme Court essentially extended the *Blakely* analysis to California's determinate sentencing scheme. Indeed, in *Cunningham*, the Court reiterated *Blakely's* determination that, "[e]xcept for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Cunningham*, --- U.S. at ----, 127 S.Ct. at 868 (citations omitted). The Court further stated:

> We cautioned in *Blakely*, however, that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Id.* at 869 (citations omitted). Therefore, it appears that *Cunningham-Blakely* precedents apply to our pre-2005 sentencing scheme and require that enhancement factors other than prior convictions be found by a jury or specifically admitted by the defendant. *See State v. Mark A. Schiefelbein*, No. M2005-00166-CCA-R3-CD, 2007 WL 465151, *48 (Tenn. Crim. App., at Nashville, Mar. 7,

2007), *perm. app. denied* (Tenn. June 18, 2007), (holding Tennessee's pre-2005-revision sentencing law was "just as determinative as Washington's scheme [as denounced in *Blakely*], because the sentence was fixed by statute in the absence of fact-finding not embraced in the jury's verdict, and just as mandatory, as well because the judge was not authorized to depart from the presumptive sentence unless he or she found certain facts not embraced in the jury's verdict"). Accordingly, the trial court's sentencing order is vacated and the cause is remanded for further proceedings consistent with this opinion.

## CONCLUSION

Following our review of the parties' briefs and applicable law, we affirm the defendant's convictions. However, we vacate the sentence imposed by the trial court and remand this case for resentencing under the sentencing scheme in place prior to the 2005 amendments with consideration of the constitutional restrictions upon enhancing the defendant's sentence above the presumptive minimum.

_____
J.C. McLIN, JUDGE